**Thomas P. Smith, Jr.**
**Alison Conn**
**Victor Suthammanont**
**Christine D. Ely**
**Suzanne Bettis\***
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-5674 (Suthammanont)**
**Email: SuthammanontV@sec.gov**
**\*Not Admitted in SDNY**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>    -- against --<br><br>**J.H. DARBIE & CO., INC.,**<br><br>        **Defendant.** | **22 Civ. 10482 ( )**<br><br>**ECF Case**<br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant J.H. Darbie & Co., Inc. ("J.H. Darbie") alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.     This case concerns J.H. Darbie's failures to comply with its legal obligation to file Suspicious Activity Reports ("SARs") with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"). Between January 2018 and January 2020 (the "Relevant Period"), J.H. Darbie, a broker-dealer registered with the Commission, generated millions of dollars in revenue in various transaction fees from brokering more than $105 million in transactions in low-priced securities[1] that are traded on over-the-counter ("OTC") markets.

---

[1]     For purposes of this Complaint, "low-priced securities" are those priced at less than $5 per share.

2.      The Bank Secrecy Act [codified at 31 U.S.C. §§ 5311-5314, 5316-5336 and 12 U.S.C. § 1829b, 1951-1959] ("BSA") and its implementing regulations require broker-dealers like J.H. Darbie to file SARs with FinCEN to report suspicious transactions conducted or attempted by, at, or through their firms. *See* 31 C.F.R. § 1023.320(a)(2). FinCEN's regulations impose deadlines for filing SARs and impose recordkeeping requirements related to such filings. Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 17a-8 thereunder require broker-dealers to comply with the recordkeeping, retention, and reporting obligations of the BSA and its implementing regulations.

3.      During the Relevant Period, J.H. Darbie had written anti-money laundering policies and procedures ("AML P&P"). The AML P&P required that J.H. Darbie file a SAR consistent with the BSA and its implementing regulations. Despite the written AML P&P, J.H. Darbie failed to implement them in multiple ways that resulted in its failure to file SARs in accordance with the BSA and its implementing regulations, Exchange Act Rules, as well as the firm's own written policies.

4.      Because J.H. Darbie failed to file SARs in compliance with its legal and regulatory obligations, J.H. Darbie deprived U.S. regulators and law enforcement of information concerning potential wrongdoing and undermined the purposes of the BSA by allowing potential illicit activity and actors to avoid scrutiny.

## **VIOLATIONS**

5.      By engaging in the conduct set forth in this Complaint, Defendant J.H. Darbie violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.

6.      Unless Defendant is permanently restrained and enjoined, it will again engage in the acts, practices, and courses of business set forth in this Complaint, and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d)(1), (d)(3), and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(3), and (d)(5)] seeking a final judgment: (a) permanently restraining and enjoining J.H. Darbie from engaging in the acts, practices, and courses of business alleged herein; and (b) imposing civil monetary penalties on J.H. Darbie pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d) and (e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communications in interstate commerce, or the mails, or the facilities of a national securities exchange.

9.      Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, J.H. Darbie is headquartered and has its principal place of business in New York, New York, transacts business within this district, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this district.

## DEFENDANT

10.     **J.H. Darbie** is a private New York corporation with its principal place of

business in New York, New York. It has been registered with the Commission as a broker-dealer

since 1998. J.H. Darbie is subject to the requirements of the BSA. The firm has a history of

disciplinary actions against it, including actions by FINRA in 2015 and the Commission in 2018,

for failing to fulfill its regulatory obligations.

## BACKGROUND ON FINCEN RULES AND FORMS

11.     The BSA, as implemented in regulations promulgated by FinCEN, requires

broker-dealers to file SARs to report, among other things, a transaction (or a pattern of

transactions of which the transaction is a part) involving or aggregating to at least $5,000 that the

broker-dealer knows, suspects, or has reason to suspect: (1) involves funds derived from illegal

activity or that was conducted to disguise funds derived from illegal activity; (2) was designed to

evade any requirements of the BSA; (3) had no business or apparent lawful purpose; or (4)

involved the use of the broker-dealer to facilitate criminal activity. *See* 31 C.F.R. §

1023.320(a)(2).

12.     FinCEN requires suspicious transactions be reported via a SAR no later than 30

calendar days after the broker-dealer detects the facts that may constitute a basis for the filing of

a SAR, subject to a 30-day extension to identify a suspect, but must report all cases within 60

days. *See* 31 C.F.R. §1023.320(b)(3). Some cases, such as ongoing money laundering schemes,

also require telephonic notification to law enforcement in addition to the timely filing of a SAR.

*Id.*

13.     FinCEN also requires broker-dealers to implement and maintain a written anti-

money laundering program that complies with the requirements set forth in the FinCEN

4

regulations and the self-regulatory organization governing the broker-dealer. *See* 31 C.F.R. § 1023.210.

14.     FINRA is the self-regulatory organization that governs J.H. Darbie.

15.     FINRA Rule 3310 requires that member broker-dealers "develop and implement a written anti-money laundering program reasonably designed to achieve and monitor the member's compliance with the requirements of the [BSA], and the implementing regulations promulgated by the Department of the Treasury."

## FACTS

**A.     J.H. Darbie's Written AML Policies and Procedures**

16.     During the Relevant Period, J.H. Darbie's AML P&P required the firm to file a SAR consistent with the BSA and FinCEN regulations as described above.

17.     In addition, the AML P&P identified certain suspicious activity or "red flags" that were to be reported to the AML Compliance Officer for his consideration as to whether further investigation and a SAR filing were necessary. As relevant here, the AML P&P enumerated red flags associated with illicit conduct in connection with the trading of low-priced securities.

18.     The red flags enumerated in the AML P&P are consistent with common patterns in illicit low-priced securities schemes such as illegal unregistered offerings and pump-and-dump schemes in which the perpetrators will engage in touts of the stock and/or manipulative trading to raise the price and/or trading volume of the security before selling their shares to the public. Once the perpetrators complete the liquidation of their shares, they typically cease the manipulative efforts and the price of the security collapses.

19.     For example, the AML P&P identified as a red flag transactions involving issuers with frequent name changes or rapidly changing business lines. One common pattern in illicit

low-priced-securities schemes is that perpetrators will take control of an existing publicly traded issuer of low-priced securities and change the name of the company and purported business prior to performing an illegal unregistered offering or pump-and-dump scheme.

20.     The AML P&P also identified the presence of stock promotional activities before or during the liquidation period (i.e., when the securities were being sold) as a red flag. As noted above, promotional campaigns designed to increase investors' interest in a particular low-priced security are often used by fraudsters to create a market for shares and/or to drive up the price of a security they intend to dump into the public market for profit.

21.     Another red flag identified in the AML P&P is the presence of unusual price fluctuations (in particular price increases occurring at a time during which a J.H. Darbie client is liquidating the low-priced securities). Unusual price fluctuations may occur in illicit schemes as the result of promotional activities or manipulative trading.

22.     The AML P&P also flagged for attention instances where investors seek to effect multiple "rapid-fire" stock conversions aggregating to substantial amounts of the shares outstanding or public float. Perpetrators of low-priced securities schemes often obtain the shares they dump to the unsuspecting public through convertible debt transactions in which they acquire purported debt of an issuer that is convertible to shares of the company. The illicit actors then convert such debt to shares, sometimes through strawmen or co-conspirators, which they then use for manipulative trading and/or to sell to the public.

23.     J.H. Darbie's AML P&P also identified as a suspicious practice the deposit of low-priced securities with a broker, liquidation or sale of such securities, followed by the withdrawal of the proceeds. This deposit, sale, and withdrawal ("DSW") practice is common in low-priced securities schemes, including illegal offerings.

24.     In addition to these red flags, J.H. Darbie's AML P&P also incorporated red flags listed in FINRA Regulatory Notice 09-05 (Jan. 2009), which identified examples of red flags indicating the possibility of an illegal, unregistered distribution. But the FINRA notice cautioned that the red-flag examples were "merely illustrative" and that other situations may arise that may signal that the broker should investigate a proposed transaction.

25.     During the Relevant Period, FINRA updated its guidance to list numerous red flags associated with securities deposits, trading, and money movement activity. *See* FINRA Regulatory Notice 19-18 (May 2019). Despite a requirement in the AML P&P that they be reviewed for possible amendment not less than annually, J.H. Darbie did not review and amend them to include the additional suspicious activity specifically identified by FINRA in this Notice.

26.     In addition to the above red flags, the AML P&P documented certain systems and processes to monitor for and investigate potentially suspicious activity.

27.     For example, the AML P&P required J.H. Darbie employees to enter information into a "Deposit Tracking System" that would automatically flag deposits by clients that aggregated to over 10% ("10% hits") or 25% ("25% hits") of the outstanding shares of the issuer over the previous three or six months.[2] J.H. Darbie's AML compliance officer was responsible for reviewing the 10% or 25% hits to identify any other red flags related to those transactions. In addition, a senior management committee was required to review the 25% hits.

28.     J.H. Darbie also designated certain securities as "Heightened Risk Securities" ("HRS"). Compliance personnel were required by the AML P&P to investigate for stock-promotional activity whenever these stocks were deposited or liquidated.

---

[2]     In September 2018, J.H. Darbie revised the threshold period from six to three months.

29.     Whenever a J.H. Darbie employee identified a transaction that potentially required the filing of a SAR, pursuant to the AML P&P, the employee was required to immediately report the transaction to the AML compliance officer, who was responsible for determining whether further investigation was necessary.

30.     A J.H. Darbie employee identifying such a "reportable transaction" under the AML P&P was required to report the transaction to the AML compliance officer using a "Suspicious Activity Referral Form."

31.     If the AML compliance officer determined to investigate suspicious activity, the AML P&P required that either he or a trade supervisor document the investigation on a Suspicious Activity Investigation form, including any supporting documentation.

32.     If the AML compliance officer determined that an investigation was unnecessary following a report of potentially suspicious activity, the AML P&P required that he document that determination in a memo to be retained in the client's file.

B.     **J.H. Darbie's Failure to File Suspicious Activity Reports**

33.     Despite having AML P&P requiring the firm to surveil for, investigate, and report suspicious conduct, J.H. Darbie failed to implement those written policies and procedures in practice. The firm's shortcomings resulted in its failure to file numerous SARs where the firm had—at the minimum—a reason to suspect illegal activity and thus a SAR filing was required pursuant to the BSA and its implementing regulations, Exchange Act Rules, and J.H. Darbie's own AML P&P.

34.     J.H. Darbie accepted for deposit the low-priced securities of approximately 160 issuers reflected in approximately 1,800 deposits at one of its clearing brokers ("Broker A"), and the further processing of approximately $105 million in net transaction proceeds to customers through approximately 12,000 sale transactions involving 30 billion shares of such issuers

between January 2018 and January 2020. As outlined below, despite multiple indicia of suspicious activity in connection with many of those transactions, the J.H. Darbie employee primarily responsible for handing such deposits and liquidations never reported a single transaction as potentially suspicious to the AML compliance officer.

35.     Although J.H. Darbie understood, as reflected in the AML P&P, that multiple "rapid-fire" conversions of convertible debt to shares of low-priced securities deposited to J.H. Darbie was an indicia of suspicious activity warranting investigation, the firm did not review every conversion and deposit of low-priced securities arising from the same debt instrument for red flags or indicia of suspicious activity.

36.     J.H. Darbie also failed to monitor for new promotional activity occurring in connection with the conversion and deposits of low-priced securities.

37.     For example, although J.H. Darbie designated certain low-priced securities as HRS and generated reports noting the daily trade volume in such securities, it did not review those reports together with information concerning close-in-time deposits of such securities or withdrawals of proceeds of the trading in such securities from customer accounts. Because the firm did not monitor the trading activity in connection with the deposit and withdrawal activity, it failed to investigate suspicious DSW activity—an indicia of potential illegal conduct.

38.     As a result, J.H. Darbie ignored or failed to investigate numerous indicia of suspicious conduct identified in FINRA guidance and the AML P&P requiring investigation to determine whether a SAR needed to be filed.

39.     In at least 168 instances, J.H. Darbie failed to investigate or file SARs in connection with suspicious DSW activity, specifically where a customer deposited shares of a

low-priced security issuer into its account, sold the shares for proceeds totaling at least $50,000, and the same customer withdrew at least $50,000, all within 31 or fewer calendar days.

    a.   Specifically, while any of the deposits, sales, or withdrawals themselves may have warranted the filing of a SAR depending on the circumstances, the withdrawal activity in particular was suspicious in light of the deposit, sale, and withdrawal pattern, which as described in paragraph 23 above, is common in low-priced securities schemes, including illegal offerings.

    b.   In the absence of a reasonable investigation that determined the activity was not suspicious and thus a SAR filing was not required, the withdrawals in light of the DSW pattern in these instances should have triggered the filing of a SAR.

40.    On at least 74 occasions, one of the broker-dealer firms that cleared J.H. Darbie's transactions rejected a deposit of low-priced securities by a J.H. Darbie customer, but J.H. Darbie did not conduct an investigation or file a SAR in connection with the deposits.

41.    In at least 32 instances, J.H. Darbie failed to file a SAR where transactions had two or more red flags identified in J.H. Darbie's AML P&P. In many of these instances, J.H. Darbie also did not investigate the transactions.

42.    The following paragraphs set forth four illustrative examples of J.H. Darbie's failure to file SARs as required.

    *(i)*    *Transactions in the Securities of "Issuer A"*

43.    For example, between August 2018 and December 2019, J.H. Darbie facilitated the deposit of more than 1.35 billion low-priced securities of "Issuer A" and the sale of more than 1.1 billion of those securities, by two of its customers, Client 1 and Client 2.

44.     Between October 2018 and December 2019, Client 1's and Client 2's deposits of Issuer A securities generated nine 10% hits and nine additional 25% hits, requiring, according to the AML P&P, review and approval of the deposits by the AML compliance officer or, in the case of the 25% hits, senior management committee review.

45.     In reviewing these deposits, J.H. Darbie personnel did not review the deposit in light of liquidation or sales activity or for other indicia of suspicious activity and often copied the approval explanation from a prior deposit.

46.     But several red flags were present during the period, including (i) stock promotion campaigns in December 2018, (ii) a 200% price increase in the value of the shares, (iii) that Issuer A's former CEO had been charged previously with conspiracy to commit mail, wire, and securities fraud, (iv) that Issuer A was previously a shell company with less than $15,000 in revenue as of its most recent Form 10-K, and (v) that Issuer A had several prior business lines and names.

47.     In addition, Client 1's sales of Issuer A securities constituted more than 70% of the daily trade volume on 14 days during the period, and Client 2's sales of Issuer A securities constituted more than 70% of the daily trade volume on 19 days during the period.

48.     Despite the red flags and suspicious activity described above, J.H. Darbie did not conduct investigations of the transactions in Issuer A, nor did it document its reasons for not conducting such investigations.

49.     As a result, J.H. Darbie failed to file SARs when it, at a minimum, had reason to suspect that the transactions in Issuer A involved funds derived from illegal activity or involved the use of the broker-dealer to facilitate criminal activity.

*(ii)     Transactions in the Securities of "Issuer B"*

50.     Between August and November 2018, J.H. Darbie accepted the deposit and facilitated the sale transactions of over 1.5 billion low-priced securities of "Issuer B" by Client 1 and Client 2. The 1.5 billion shares constituted nearly 70% of Issuer B's issued and outstanding shares as of November 30, 2018.

51.     As early as July 2018, J.H. Darbie was aware or should have been aware of multiple suspicious circumstances and red flags related to Issuer B and its securities.

52.     First, Issuer B, as recently as 2016, had changed its purported business line from an e-cigarette business to a security technology business.

53.     Second, Issuer B's most recent Form 10-K reported that the company had no employees, no intellectual property, no revenue, total assets of $1,684, and had no expenditures relating to research or development over the prior two fiscal years—all of which indicated that the company was or may have been a shell issuer.

54.     Third, in July 2018, J.H. Darbie initially refused to accept a deposit of Issuer B securities by Client 1 because of promotional activity in the stock.

55.     Nevertheless, in August 2018, Client 1 and Client 2, in numerous successive deposits, deposited shares of Issuer B at J.H. Darbie. Client 1 and Client 2 obtained the shares of Issuer B directly from the issuer in the form of convertible notes in July and November of 2017.

56.     Between August 2018 and November 2018, Client 1 had seven 10% hits and Client 2 had four 10% hits and nine additional 25% hits that required J.H. Darbie, according to its AML P&P, to investigate and approve the deposits.

57.     Over the same period, Client 1 and Client 2 sold their shares to the public in heavy trading. Client 1 and Client 2 traded Issuer B securities on 42 and 40 trading days,

respectively. Client 1 sales constituted more than 25% of the daily trading volume of Issuer B on ten days. Client 2 sales accounted for more than 40% of the daily trading volume of Issuer B on eight days.

58.     On at least three occasions during the period, J.H. Darbie compliance acknowledged in internal documents the price and/or volume increases in Issuer B securities.

59.     J.H. Darbie refused to accept a deposit of Issuer B securities by Client 2 because of promotional activity by the issuer in the stock in October 2018. Although J.H. Darbie temporarily paused deposits of Issuer B securities following this promotion, and a resulting price increase, it did not conduct an investigation or file a SAR.

60.     Despite the red flags and suspicious activity described above, J.H. Darbie never conducted an investigation of the transactions in Issuer B, nor did it document its reasons for not conducting such investigation.

61.     As a result, J.H. Darbie failed to file SARs when it, at a minimum, had reason to suspect that the transactions in Issuer B involved funds derived from illegal activity or involved the use of the broker-dealer to facilitate criminal activity.

*(iii)     Transactions in the Securities of "Issuer C"*

62.     Between January 2018 and December 2019, J.H. Darbie facilitated the deposit and sale of over 13 million low-priced shares of "Issuer C" by ten J.H. Darbie clients.

63.     Since 2008, Issuer C has had three different names and business lines.

64.     From July 2018 through September 2018, Issuer C was highlighted in at least thirteen promotional articles by a stock promoter.

65.     In July 2018 alone, J.H. Darbie clients accounted for over 30% of the daily trading volume in Issuer C on 14 separate days.

66.     In August 2018, one of J.H. Darbie's clearing brokers ("Broker B") rejected a deposit of Issuer C shares by a J.H. Darbie customer ("Client 3") that coincided with price spikes and stock promotions of Issuer C's shares. Broker B informed J.H. Darbie of the reason for the denial, but J.H. Darbie's clients continued to liquidate shares of Issuer C throughout August 2018, and J.H. Darbie never conducted any investigation of transactions in Issuer C, nor did it file a SAR.

67.     In September 2019, Issuer C was again the subject of stock promotional activity.

68.     Client 4—which had common beneficial owners as Client 3—deposited over 200,000 shares of Issuer C on September 9, 2019, and sold over 180,000 of those shares over the next four trading days—accounting for more than 10% of the daily trading volume on each of the days it traded. After selling its shares, Client 4 withdrew approximately $960,000—which included its entire net proceeds from the sales—on September 26, 2019.

69.     Despite the suspicious DSW activity by Client 4, J.H. Darbie did not conduct an investigation or file a SAR.

70.     In addition, J.H. Darbie clients accounted for high percentages of the daily trading volume for Issuer C on numerous occasions—Client 4 constituted over 46% of the daily trading volume on 30 days and sales by three other clients constituted over 40% of the daily trading volume on 9 other days.

71.     Despite the red flags and suspicious activity described above, J.H. Darbie did not conduct an investigation of the transactions in Issuer C, nor did it document its reasons for not conducting such investigation.

72.     As a result, J.H. Darbie failed to file SARs when it, at a minimum, had reason to suspect that the transactions in Issuer C involved funds derived from illegal activity or involved the use of the broker-dealer to facilitate criminal activity.

*(iv)     Transactions in the Securities of "Issuer D"*

73.     In a three-month period between May 2018 and July 2018, J.H. Darbie facilitated the deposit and sale of over 3.8 million low-priced securities of "Issuer D" by Client 4.

74.     Issuer D was purportedly a health-care company, but prior to a name change in 2016, Issuer D purportedly was a manufacturer of commercial boats.

75.     J.H. Darbie knew from due diligence it conducted in accepting a deposit of shares of Issuer D that the company was mentioned in reporting concerning the "Panama Papers" and that a former Issuer D director was the subject of a Commission enforcement action and subject to an order barring him from engaging in the offer of penny stocks.

76.     J.H. Darbie was also aware that one of its clearing brokers, Broker B, rejected a deposit by Client 4 of Issuer D securities from J.H. Darbie in February 2018 due to, as it informed J.H. Darbie, the inability to substantiate promotional press releases by Issuer D.

77.     Despite Broker B's rejection of the deposit and the promotional activity it flagged, J.H. Darbie performed no further investigation and did not file a SAR. In fact, J.H. Darbie permitted Client 4 to deposit the shares again beginning only three months later, this time through Broker A.

78.     Between May and July 2018, Client 4's sales of Issuer D securities constituted more than 50% of the daily trading volume on more than 30 trading days.

79.     In addition, Client 4 engaged in suspicious DSW activity. Between May 4, 2018 and July 30, 2018, Client 4 deposited over 4.4 million shares of Issuer D, sold approximately 3.8

million shares, and wired out the entire net proceeds of those sales—over $116,000—in a series of wires throughout that three-month period.

80.    On July 10, 2018, J.H. Darbie conducted a suspicious activity investigation in accordance with its AML P&P and restricted trading in Issuer D. But J.H. Darbie did not include any documentation of its investigation in its internal investigation report and failed to note the other suspicious activity related to the trading in Issuer D securities.

81.    Nor did J.H. Darbie file a SAR in connection with this instance of suspicious activity.

82.    On the very next day, July 11, 2018, J.H. Darbie allowed Client 4 to deposit more than 10% of the outstanding shares in Issuer D.

83.    Despite the red flags and suspicious activity described above, J.H. Darbie failed to file SARs when it, at a minimum, had reason to suspect that the transactions in Issuer D involved funds derived from illegal activity or involved the use of the broker-dealer to facilitate criminal activity.

**C.    J.H. Darbie's Failure to Make or Maintain Internal Reports**

84.    As described above, despite having an AML P&P requiring the firm to surveil for, investigate, and report suspicious conduct, J.H. Darbie failed to implement those written policies and procedures in practice, including failing to make or maintain internal reports concerning suspicious activity by its clients.

85.    Although the AML P&P required J.H. Darbie employees to utilize the "Suspicious Activity Referral Form" to report suspicious transactions for investigation by the AML compliance officer, the firm was unable to produce to the Commission any such forms as required by Section 17(a) of the Exchange Act for the Relevant Period. Either no such forms

were actually utilized during the Relevant Period or J.H. Darbie did not retain such forms as required by Section 17(a) and Rule 17a-4.

86.     In addition, with respect to the review of the 10% and 25% hits described above in paragraph 27, J.H. Darbie either failed to investigate, failed to document its investigation of those transactions in accordance with its AML P&P, or failed to maintain documents of its investigation in accordance with Section 17(a) and Rule 17a-4 of the Exchange Act.

87.     Moreover, J.H. Darbie's AML P&P required that 25% hits be reviewed by a senior management committee and that sales of such low-priced securities could not occur without written documentation of the committee's approval and the basis for such approval (or disapproval if such sales were rejected).

88.     But the senior management committee either failed to review the 25% hits, failed to document its review and approval determination, or failed to maintain records of its review and approval determination in at least 100 instances.

89.     Although J.H. Darbie's AML P&P required the firm to conduct investigations of potentially reportable activity or document the reasons for not conducting such investigation, in many instances, J.H. Darbie neither conducted an investigation nor documented the basis for failing to do so. Where J.H. Darbie did complete its "Suspicious Activity Investigation" forms during the Relevant Period, it failed to maintain the supporting documentation for such forms in numerous instances in accordance with Section 17(a) and Rule 17a-4 of the Exchange Act.

## CLAIM FOR RELIEF
### Violations of Section 17(a) of the Exchange Act and Rule 17a-8 Thereunder

90.     The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 89, as though fully set forth herein.

91.     As detailed above, J.H. Darbie failed to file SARs as required by the BSA and its implementing regulations.

92.     As detailed above, J.H. Darbie failed to comply with the reporting, recordkeeping, and record retention requirements of FinCEN's regulations implementing the BSA, which among other things, require broker-dealers to implement and maintain a written anti-money laundering program that complies with the requirements set forth in the FinCEN regulations and the self-regulatory organization governing the broker-dealer. *See* 31 C.F.R. § 1023.210.

93.     By virtue of the foregoing, J.H. Darbie violated, and unless restrained and enjoined, will again violate Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-8 thereunder [17 C.F.R. §24.17a-8].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

A Final Judgment permanently restraining and enjoining Defendant, its agents, servants, employees and attorneys and other persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise from violating, or aiding and abetting violations of, Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-8 thereunder [17 C.F.R. § 240.17a-8];

### II.

A Final Judgment directing the Defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## III.

Such other and further relief as this Court deems appropriate and necessary for the benefit of investors.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York        SECURITIES AND EXCHANGE COMMISSION
       December 12, 2022

By: _/s/ Thomas P. Smith, Jr. _____
     Thomas P. Smith, Jr.
     Alison Conn
     Victor Suthammanont
     Christine D. Ely
     100 Pearl Street, Suite 20-100
     New York, NY 10004-2616
     (212) 336-5674 (Suthammanont)
     Email: SuthammanontV@sec.gov

     Attorneys for Plaintiff

Of Counsel:
     Suzanne Bettis*
     Securities and Exchange Commission
     100 Pearl Street, Suite 20-100
     New York, NY 10004-2616

* Not admitted in the U.S. District Court for the
     Southern District of New York